FILED'08 AUG 13 12:03 USDC-ORP

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.   O8-185-Ki |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLEA AGREEMENT** |
| | ) | |
| KINDER MORGAN | ) | |
| BULK TERMINALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

1.      The United States of America, by and through the United States Attorney for the

District of Oregon and the Department of Justice, Environment and Natural Resources Division,

Environmental Crimes Section, and the defendant, KINDER MORGAN BULK TERMINALS,

INC., (the "defendant"), through its authorized representative, enter into the following

Agreement, pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

2.      <u>The Charges and Penalties</u>.  The defendant, having been advised of the right to

have this matter tried before a jury, agrees to waive that right and plead guilty to the charge set

forth in Count 1 of an Information to be filed in this district.  Count 1 of the Information alleges

that the defendant violated the Marine Protection, Research, and Sanctuaries Act (MPRSA), 33

U.S.C. § 1401 *et seq*., more commonly known as the Ocean Dumping Act, which makes it a

crime to knowingly transport or cause to be transported, without a permit, certain materials from

the United States for the purpose of dumping the materials into ocean waters. Defendant hereby

waives all objections to the form of the charging documents, admits that, by and through its

employees acting on behalf of and for the benefit of the corporation, it is in fact guilty of the

offense as set forth in the Information and that the Joint Factual Statement dated this same day

and included as Attachment "A" to this Plea Agreement is an accurate statement of its criminal conduct.

3.     <u>Probationary Term and Fine.</u>  The count carries a term of probation of at least one year and not more than five years, and a maximum fine of  $500,000, or twice the gross gain or loss resulting from the unlawful conduct, and a special assessment of $400.

4.     <u>Elements of the Offense.</u>  Defendant, through its authorized representative, acknowledges that it is aware of the nature and elements of the offense to which it is entering its guilty plea.  Under well-established principles of corporate liability and *respondeat superior*, as these principles apply in this case, the corporate defendant is liable for the actions of its agents and employees acting within the scope of their employment and for the benefit of the corporation. *New York Central and Hudson River R.R. v. United States*, 212 U.S. 481, 495 (1909); *United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979); *United States v. Hilton Hotels Corporation*, 467 F.2d 1000, 1004-07 (9th Cir.1972).  Specifically, if this case were to proceed to trial, the government would have the burden of proving beyond a reasonable doubt the elements of the offense as listed below.

The elements of the offense of  Transporting Material for Dumping in Ocean Waters Without a Permit - 33 U.S.C. §§ 1411 (a) and 1415 (b)(1) are as follows: (1) the defendant, by and through its agents and employees, transported or caused to be transported from the United States; (2) material; (3) for the purpose of dumping the material into ocean waters; (4) without a permit issued under the MPRSA; and (5) the defendant acted knowingly.

5.     <u>Rights Waived by Pleading Guilty.</u>  Defendant knowingly and voluntarily waives the following rights through its guilty plea:

(A)     The right to plead not guilty, and to persist in a plea of not guilty;

(B)     The right to a speedy and public trial before a jury;

(C)     The right to the effective assistance of counsel at trial;

(D)     The right to be presumed innocent until guilt has been established at trial, beyond a reasonable doubt;

(E)     The right to confront and cross-examine witnesses at trial;

(F)     The right to compel or subpoena witnesses to appear on defendant's behalf at trial; and

(G)     The right to appeal a finding of guilt or any pretrial rulings.

6.      <u>Applicability of Sentencing Guidelines</u>.  Defendant understands and acknowledges that, at sentencing, the Court is required to take account of the United States Sentencing Guidelines (USSG), together with the other sentencing goals set forth in 18 U.S.C. § 3553(a).  Defendant understands and acknowledges that the United States Sentencing Guidelines, including Chapter Eight that provides guidance for the sentencing of corporate defendants, may be considered by the Court, except that pursuant to USSG §§ 8C2.1 and 8C2.10, the United States Sentencing Guidelines are not applicable for purposes of determining a fine.  Instead, the fine is to be determined under 18 U.S.C. §§ 3553 and 3571.

7.      <u>Sentencing Recommendation Agreement</u>.  The government and defendant agree to recommend a total monetary penalty consisting of two hundred forty thousand dollars ($240,000), in addition to the mandatory special assessment.  The parties agree to recommend that the sentence should be imposed as follows:

(A)  <u>Fine</u>.  Defendant shall pay a total criminal fine in the amount of 65% of two hundred and forty thousand dollars ($240,000) or one hundred fifty-six thousand dollars ($156,000).

(B)  <u>Mandatory Special Assessment</u>.   Defendant shall pay a special assessment for one count of conviction for a total special assessment amount of four hundred dollars ($400).

(C) <u>Community Service</u>. Defendant shall make an organizational community service payment in the amount of eighty-four thousand dollars ($84,000) pursuant to § 8B1.3 of the Federal Sentencing Guidelines and in furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a). Accordingly, defendant shall make the payment to the Oregon Governor's Fund for the Environment, a sustained granting fund managed by the National Fish and Wildlife Foundation to benefit the coastal areas and rivers and streams passing through the District of Oregon by funding projects to (a) reduce pollution and otherwise cleanup Oregon rivers, streams, and coastal areas; (b) restore and preserve fish, wildlife, and plant resources critical to Oregon rivers, streams and coastal areas; (c) identify continuing sources of pollution of Oregon rivers, streams and coastal areas; (d) develop and implement strategies to eliminate and/or reduce pollution of Oregon rivers, streams and coastal areas; and (e) improve state and local criminal enforcement of environmental and wildlife protection laws intended to protect Oregon rivers, streams and coastal areas.

(D) <u>Payments</u>. Defendant further agrees that if the Court imposes sentence in accordance with the terms of this agreement, the monetary penalties, including the fines, community service, and special assessments, shall be paid on the day of sentencing.

(E) <u>Probation</u>. Further, the government and the defendant agree that the defendant will be placed on organizational probation for a period of two years pursuant to 18 U.S.C. § 3561(c)(1) and consistent with USSG §§ 8D1.1 and 8D1.2. The terms of probation, including special conditions of probation, shall include:

(1) <u>No Further Violations</u>. Defendant agrees that it shall commit no further criminal violations of federal, state or local law, including those laws and regulations for which primary enforcement has been delegated to state authorities.

(2) <u>Payments</u>. At sentencing, and upon payment in full of all monetary amounts set forth herein, the defendant may move to be relieved of any requirement to provide regular financial reports to the Office of Probation. The United States agrees to take no position regarding any such motion.

8. <u>Application of the Agreement</u>. This Agreement shall bind defendant and its successors and assigns. Defendant, or its successors-in-interest, if applicable, shall provide to each undersigned prosecuting office and the United States Probation Office in the District of Oregon immediate notice of any name change, corporate reorganization, or similar action

affecting this Agreement. Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this Agreement.

9.    <u>Court Not Bound By Agreement.</u> Defendant acknowledges that the Court and United States Probation Office are not bound by this agreement. The defendant further recognizes that if the Court should sentence defendant differently from the recommendations in this Agreement, the defendant shall not have the right to withdraw its guilty plea. Both parties agree to support the disposition recommended in this agreement at the time of sentencing pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

10.    <u>Parties to the Agreement.</u> This plea agreement is between this United States Attorney's Office, The Department of Justice Environment and Natural Resources Division, Environmental Crimes Section, and defendant, and does not bind any other federal, state, or local prosecuting, administrative, or regulatory authority. This agreement does not apply to any other charges other than those specifically mentioned herein.

11.    <u>Non-Prosecution of Additional Offenses.</u> Provided that the defendant complies fully with the terms of this agreement, the United States agrees to forgo additional criminal prosecution in the District of Oregon against defendant, for any additional environmental or related offenses including, but not limited to, Ocean Dumping, Clean Water Act violations, Clean Air Act violations, false statements or related acts of obstruction, occurring before the date of this agreement and known to the government at the time of the signing of this agreement.

12.    <u>Corporate Authorization.</u> Defendant agrees that it is authorized to enter into this Agreement. At the time of signing by defendant's authorized corporate representative, defendant shall provide the government with a written statement in the form of a corporate resolution certifying that the corporate representative is authorized to enter into and comply with

all the terms of this Agreement. The corporate resolution shall certify that defendant's Board of Directors has authorized the corporate representative to take these actions and that all corporate formalities for such authorizations have been observed. The defendant agrees that the plea of guilty will be entered by the defendant through David R. DeVeau, Vice President/Deputy General Counsel, and that he is authorized to enter a plea of guilty on the defendant's behalf. By entering this guilty plea, the defendant hereby waives all objections to the form of the charging document and admits that it is in fact guilty of the offense as set forth in the Information,

13.    <u>Waiver of Appeal</u>.  Defendant knowingly, intelligently, and voluntarily waives its right to appeal its conviction in this case. Defendant similarly knowingly, intelligently, and voluntarily waives its right to appeal the sentence imposed by the court, provided its sentence is no greater than the maximum set out in paragraph 3. In addition, defendant knowingly, intelligently, and voluntarily waives its right to bring a collateral challenge pursuant to 28 U.S.C. § 2255, against either its conviction, or the sentence imposed in this case, except for a claim of ineffective assistance of counsel.   The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn.

14.    <u>Completeness of Agreement</u>.  The government and defendant acknowledge that these terms constitute the entire Agreement between the parties. This Agreement is effective upon signature by defendant, its attorneys, and all of the attorneys for the government.

AGREED AND ACCEPTED

KARIN J. IMMERGUT
United States Attorney for the District of Oregon


_____          8-13-08
DWIGHT C. HOLTON                          _____
Assistant United States Attorney          Date


_____          8-15-08
J. RONALD SUTCLIFFE                       _____
Trial Attorney                            Date
U.S. Dept. of Justice
Environment and Natural Resources Division
Environmental Crimes Section


On behalf of the defendant, KINDER MORGAN BULK TERMINALS, INC., I have been authorized by a corporate resolution to sign this agreement and bind KINDER MORGAN BULK TERMINALS, INC., KINDER MORGAN BULK TERMINALS, INC., has been advised by its attorneys of its rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this Agreement. KINDER MORGAN BULK TERMINALS, INC., voluntarily agrees to all of the terms of this Agreement. No promises or inducements have been made to KINDER MORGAN BULK TERMINALS, INC., other than those contained in this Agreement. No one has threatened or forced KINDER MORGAN BULK TERMINALS, INC., in any way to enter into this Agreement. Finally, KINDER MORGAN BULK TERMINALS, INC., is satisfied by the representation of its attorneys in this matter.


_____          8/13/08
David R. DeVeau                           _____
KINDER MORGAN                             Date
BULK TERMINALS, INC.
Defendant


I am KINDER MORGAN BULK TERMINALS, INC.'S attorney. I have carefully discussed every part of this Agreement with authorized representatives of KINDER MORGAN BULK TERMINALS, INC.. Further, I have fully advised the authorized representative of KINDER MORGAN BULK TERMINALS, INC.'s rights, of possible defenses, of the Sentencing Guidelines provisions, and of the consequences of entering into this Agreement. To my knowledge, the decision of KINDER MORGAN BULK TERMINALS, INC., to enter into

this Agreement is an informed and voluntary one.

Mark W. Schneider
Attorney for Defendant
KINDER MORGAN
BULK TERMINALS, INC.

8/13/08
Date

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | Case No. _C8-185 CKI_ (D. Oregon) |
| ) | |
| ) | |
| v.    ) | |
| ) | |
| KINDER MORGAN    ) | |
| BULK TERMINALS, INC.,    ) | |
| ) | |
| Defendant.    ) | |

## JOINT FACTUAL STATEMENT

### I.    Introduction

The United States of America, by and through the United States Attorney for the District of Oregon, and the Environmental Crimes Section of the United States Department of Justice (collectively referred to herein as "the United States" or "the government"), and the Defendant KINDER MORGAN BULK TERMINALS, INC., (referred to herein as " KMBT," or " defendant"), hereby agree that this Joint Factual Statement is a true and accurate statement of the criminal conduct committed by defendant' s employees, acting within the scope of their employment and for the benefit of the defendant, and that it provides a sufficient basis for the defendant's plea to an Information filed this same date in the District of Oregon. Defendant' s guilty plea is to be entered pursuant to the Plea Agreement signed and dated this same day.

KMBT is the contract operator of a terminal in Portland, Oregon ("Terminal 5") which is owned by Portland Bulk Terminals L.L.C. Pursuant to its Facilities Operating Agreement, KMBT, receives stores and loads potash on behalf of Canpotex Limited, a Canadian corporation. Canpotex arranges for the shipment of potash in railcars from Canada to Terminal 5 where KMBT then loads the potash onto bulk cargo vessels for shipment overseas, usually to Asia.

1    Potash is potassium chloride, a substance sometimes used as a salt substitute and also

2    used as fertilizer.  In August of 2003, KMBT received a shipment of potash via rail cars.  In the

3    process of loading the potash into the hold of a waiting bulk cargo vessel, independent inspectors

4    hired by Canpotex determined that several rail cars (about 160 metric tons) of potash had come

5    into contact with water.  Potash comes in a powdery form, but when water comes into contact

6    with potash it "clumps" rendering it unsaleable to large commercial buyers of potash.

7    KMBT' s night superintendent arranged with the master of the vessel taking on the load

8    of potash to load the wet off-specification potash on the vessel' s deck for later disposal into

9    the ocean.

10    A.    The Ocean Dumping Act.

11    The Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1401 *et seq.*, more

12    commonly known as the Ocean Dumping Act, makes it a crime to knowingly transport or

13    cause to be transported, without a permit, certain materials from the United States for the

14    purpose of dumping the materials into ocean waters.  Under §§ 1411 (a) and 1415 (b)(1) of the

15    Act, to sustain a conviction of the Ocean Dumping Act the United States must prove beyond a

16    reasonable doubt that a person (which includes corporations) knowingly, without a permit,

17    transported or caused others to transport, material, from the United States for the purpose of

18    dumping it into ocean waters.  Essentially, the government needs to show that the defendant

19    intended to bring about the dumping of material into the ocean.  The Ocean Dumping Act

20    defines "material" to include "matter of any kind or description including, but not limited to,

21    dredged material; solid waste; incinerator residue; garbage; sewage; sewage sludge; munitions;

22    radiological, chemical, and biological warfare agents; medical wastes; radioactive materials;

23    chemicals; biological and laboratory waste; wrecked or discarded equipment; rock; sand;

24    excavation debris; and industrial, municipal, agricultural, and other waste." 33 U.S.C. § 1402 (c).

25    The parties agree in this case that potash is a material prohibited from disposal by the Act.

26    The Ocean Dumping Act also contains a jurisdictional element which requires the

27    dumping to occur in "ocean waters."  The Act defines ocean waters as "those waters of the open

28

*United States v. Kinder Morgan*
Joint Fact Statement
Page 2

1   seas lying seaward of the baseline from which the territorial sea is measured as found in the

2   Convention on the Territorial Sea and the Contiguous Zone." 33 U.S.C. § 1402 (b). The parties

3   in this case agree that the dumping took place at sea for purposes of the Act.  The government is

4   not required to prove harm to the environment as a result of the ocean dumping.  The parties

5   agree in this matter that there was, in fact, no known harm to the environment as a result of the

6   dumping.

7       B.      *Respondeat Superior* Liability of Corporations for the Acts of Employees.

8       A corporation may be held liable for "the criminal acts of its agents" so long as those

9   agents are acting within the scope of employment. *United States v. Cincotta*, 689 F.2d 238, 241

10  (1st Cir. 1982). The test is whether the agent is "performing acts of the kind which he is

11  authorized to perform," and those acts are "motivated-at least in part-by an intent to benefit the

12  corporation." *Cincotta*, 689 F.2d at 241-42.

13      The legal rules for imputing criminal responsibility to corporations are built upon

14  analogous rules for civil liability.  The scope of employment test does not require specific

15  directives from the board or president for every corporate action; it is enough that the type of

16  conduct (making contracts, driving the delivery truck) is authorized. *See United States v. Beusch*,

17  596 F.2d 871, 877-78 (9th Cir.1979).

18      While KMBT had in place at the time of the ocean dumping rules to prohibit employees

19  from engaging in actions harmful to the environment, "[e]ven a specific directive to an agent or

20  employee or honest efforts to police such rules do not automatically free the company for the

21  wrongful acts of agents.  Thus, the principal is held liable for acts done on his account by a

22  general agent which are incidental to or customarily a part of a transaction which the agent has

23  been authorized to perform. And this is the case, even though it is established fact that the act

24  was forbidden by the principal." *United States v. Potter*,  463 F. 3d 9, 27 (1st Cir. 2006) citing,

25  H. Reuschlein & Gregory, *The Law of Agency and Partnership*, 167 (1990).

26      KMBT employees on duty the night the ship sailed with the potash on deck were

27  performing acts they were authorized to perform such as loading ships and dealing with the

28

*United States v. Kinder Morgan*
Joint Fact Statement
Page 3

1  problems that arise in the loading of a specialty product like potash onto a vessel. The actions of

2  the employees were motivated by an intent, albeit misplaced and wrong, to benefit the customer

3  and the corporation. The employees' actions constituted a violation of KMBT policy, and no

4  KMBT personnel outside of the terminal either approved or had any knowledge of the night

5  superintendent's arrangement with the vessel master to dump the potash at sea. However,

6  KMBT has accepted responsibility for the actions of its employees by signing the attached Plea

7  Agreement.

8  **II.    Factual Background**

9      On August 7, 2003, Terminal-5 loaded potash into a vessel known as the *J/A Aladdin

10 Dream II*. During the loading of the vessel a quality control inspector hired by Canpotex (the

11 shipper of the potash) noticed clumped potash. The inspector determined the load had come into

12 contact with water and therefore the potash did not meet Canpotex's specifications. Canpotex

13 determined that approximately 160 metric tons were off-specification. KMBT and Canpotex

14 considered several options to deal with the off-specification potash. One solution included

15 paying longshoremen to unload the clumped potash. KMBT's night superintendent found that it

16 would cost $80,000 to dispose of the potash in a landfill and there were no front-end loaders

17 available to load the potash nor were the conveyor belts reversible, to load the potash back into

18 rail cars for disposal. The alternative of off-loading the materials to a barge for $10,000 was also

19 rejected. Under KMBT's operating agreement at Terminal 5, the costs of such disposal, in this

20 instance, would not have ultimately been incurred by KMBT, but by the shipper.

21      KMBT's night superintendent asked the terminal manager if he could speak with the

22 master of the vessel about taking the clumped potash on board the vessel. The night

23 superintendent arranged to pay the Master of the vessel the *J/A Aladdin Dream II*  $1,250 to

24 dispose of the potash, then borrowed $700 in cash from an International Longshoreman Worker's

25 Union "walking boss" to supplement KMBT's cash on-hand. The night superintendent intended

26 that the payment to the vessel master would result in disposal of the potash overboard at sea.

27

28

The *J/A Aladdin Dream II* left port in the early hours of August 8, 2003. Once the vessel was beyond 500 miles off the coast of the United States, crew members started dumping potash off the vessel. It took approximately 9 hours to dispose of the entire 160 metric tons of potash overboard. The parties agree in this matter that there was no harm to the environment as a result of the potash disposal at sea.

The day after the terminal loaded the clumped potash aboard the *J/A Aladdin Dream II*, the terminal manager wrote an email to his assistant at the terminal to obtain money to repay the loan obtained to pay the master of the *J/A Aladdin Dream II* for taking the potash. The email indicates that the money was necessary, "to convince the vessel to load the contaminated cargo aboard it." The same day the terminal manager also sent the night superintendent a congratulatory email: "Without your assistance in the loading and sailing of this vessel, the terminal would have incurred additional and unwanted charges." KMBT repaid the walking boss' loan the next day and added a $50 bonus.

### III.    Defendant's Cooperation

After the incident was reported, KMBT cooperated fully with the government's investigation, promptly adopted remedial measures at the KMBT Terminal 5 facility to avoid future incidents of ocean dumping, and incurred substantial expense refitting the facility to better enable it to deal with off-specification potash. KMBT and its night superintendent who brokered the dumping reached an agreement whereby he would no longer work at any of KMBT's facilities. KMBT acted to take responsibility for the incident by agreeing to a plea in this matter which saves the government the expense of a trial.


AGREED AND ACCEPTED


KARIN J. IMMERGUT                                   U.S. DEPARTMENT OF JUSTICE
United States Attorney for the District of Oregon   Environmental Crimes Section


_____                             _____
Dwight C. Holton                                    J. Ronald Sutcliffe


*United States v. Kinder Morgan*
Joint Fact Statement
Page 5

Assistant United States Attorney                    Trial Attorney

FOR KINDER MORGAN BULK TERMINALS, INC.

_____                    _____

Witnessed by

_____

And Accepted by Counsel:

_____                    _____

Attorney to Defendant KMBT                         Attorney to Defendant KMBT

Dated: March __, 2008
       Portland, Oregon

*United States v. Kinder Morgan*
Joint Fact Statement
Page 6

KINDER MORGAN BULK TERMINALS, INC.

SECRETARY'S CERTIFICATE

I, Joseph Listengart, Secretary of Kinder Morgan Bulk Terminals, Inc. ("KMBT"), do hereby certify that attached hereto as Exhibit A is a full, true and correct copy of the resolutions duly adopted by the Board of Directors of KMBT on June 11, 2008.

Dated:  August 5, 2008

_____

Joseph Listengart, Secretary of
KINDER MORGAN BULK TERMINALS, INC.

EXHIBIT A

RESOLVED:   That Kinder Morgan Bulk Terminals, Inc. ("KMBT") be and it hereby is authorized to enter into a Plea Agreement, Joint Fact Statement and any ancillary and necessary documents relating to the August 2003 incident in Portland Oregon at KMBT's Terminal 5, with the United States of America, acting by and through The United States Attorney for the District of Oregon and the Department of Justice, Environmental and Natural Resources Division, Environmental Crimes Section, pursuant to which KMBT will (i) plead guilty to one felony count alleging violation of the Marine Protection, Research, and Sanctuaries Act, 33 USC § 1401 et seq., more commonly known as the Ocean Dumping Act; (ii) be placed on probation for a period of two (2) years on the terms set forth in the Plea Agreement; (iii) pay a criminal fine in the amount of $156,000.00 plus a Community Service payment of $84,000.00 and an additional assessment of $400.00.

RESOLVED:   That David DeVeau, Deputy General Counsel, be and he hereby is authorized and empowered on behalf of KMBT to execute the Plea Agreement and Joint Fact Statement; to enter the plea as described in the foregoing resolution in the United States District Court for the District of Oregon; and to execute on behalf of KMBT any and all additional ancillary documents as may be necessary to effect the terms of the settlement as described in the foregoing resolution.